Approved: _____
KATHERINE R. GOLDSTEIN
Assistant United States Attorney

Before:   THE HONORABLE Debra C. Freeman,
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    SEALED COMPLAINT

          - v. -                  :    Violation of
                                       18 U.S.C. §§ 1341, 1349
ALEXANDER KAPLAN,                 :
                                       COUNTY OF OFFENSE:
          Defendant               :    NEW YORK

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     MICHAEL SEIFER, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE

     1.   From at least in or about December 2005, up to and including in or about June 2007, in the Southern District of New York and elsewhere, ALEXANDER KAPLAN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 1341 and 1349 of Title 18, United States Code.

     2.   It was a part and an object of the conspiracy that ALEXANDER KAPLAN, the defendant, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, unlawfully, willfully and knowingly would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did take and receive therefrom, such matters and things, and would and did knowingly cause to be delivered by mail according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18,

United States Code, Section 1341.

<u>Overt Acts</u>

3. On or about January 13, 2006, ALEXANDER KAPLAN, the defendant, supervised the closing of the purchase of certain apartments, located in New York, New York, at the law office of KAPLAN, the defendant.

4. On or about January 23, 2006, ALEXANDER KAPLAN, the defendant, supervised the closing of the purchase of certain apartments, located in New York, New York, at the law office of KAPLAN, the defendant.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge of the foregoing charge are, in part, as follows:

5. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and am currently assigned to a squad that investigates Eurasian organized crime. I have been a Special Agent for approximately three years. During that time, I have participated in numerous investigations of organized crime. As part of my training and experience, I have also conducted and participated in interviews of witnesses, the execution of search warrants, debriefings of informants, and I have reviewed recorded conversations and various business record and reports. Because this affidavit is being submitted for a limited purpose, I have not included details of every aspect of this investigation. Where conversations or statements are related herein, they are related in substance and in part.

6. In or about May 2006, other federal agents and I began an investigation of mortgage fraud being committed by several mortgage brokers and their associates in the Southern District of New York and elsewhere. As a result of that investigation, a grand jury in this District returned indictment 06 Cr. 1179, <u>United States</u> v. <u>Aleksander Lipkin</u>, et al. (the "Indictment"). As detailed in the Indictment, Aleksander Lipkin ("Lipkin") and 22 co-conspirators were charged with engaging in an illegal scheme to defraud various lenders by submitting applications and supporting documentation for mortgages and home equity loans with materially false or misleading information, to induce those lenders to make loans to persons and at terms that the lenders otherwise would not have funded.

7. Following the return of the Indictment, the FBI

continued its investigation of the mortgage fraud scheme directed by Lipkin and other co-conspirators not named in the Indictment. In the ensuing investigation, other agents and I learned that Lipkin and others, including ALEXANDER KAPLAN, the defendant, fraudulently obtained mortgages and home equity loans from various lending institutions in connection with the purchase and financing of ten apartments in a residential condominium located at 243 West 98th Street, New York, New York.

THE SCHEME TO DEFRAUD

8. In or about January 2006, Lipkin and a co-conspirator not named herein ("CC-1"), through a corporate entity called A&L Innovative Solutions, Inc. ("A&L"), purchased a block of ten apartments at 243 West 98th Street, New York, New York, including Apartments 2B, 2C, 3A, 3B, 4B, 4C, 5E, 6E, 7A, and 7E ("the Apartments") for approximately $8 million. A&L purchased the block of apartments from 243 West 98th Street Units LLC, an entity controlled by the seller ("the Seller"). The Seller was represented in this transaction by an attorney (the "Seller's Attorney"). Lipkin and CC-1 were represented at all times by ALEXANDER KAPLAN, the defendant.

9. I have reviewed documents regarding the sale of the Apartments, including a contract, as well as other documents, and have learned the following:

a. The contract consisted of several parts ("the Master Contract"). Among those documents was a document entitled "Contract of Sale," and a document entitled "Rider Annexed to and Forming a Part of Contract of Sale Relating to Those Certain Apartments (The 'Unit' or the 'Units') Located in the 243 West 98 Condominium Between 243 West 98th Street Units LLC ('Seller') and A&L Innovative Solutions, Inc. ('Purchaser')" (the "Master Rider"). The Master Contract was dated on or about December 6, 2005.

b. The Contract of Sale was a form contract that provided for standard terms of the sale. The Master Rider, on the other hand, set forth certain terms specific to this transaction, including the following key provisions:

(1) At the time that A&L purchased the Apartments, the Apartments were all occupied by tenants, and subject to New York's rent regulation laws; and

(2) A&L intended to sell the Apartments to five different people ("the Individual Purchasers"). Each

Individual Purchaser was to purchase two of the Apartments. The Individual Purchasers were affiliated with A&L, and were sophisticated investors.

   c. A document attached to the Master Rider set forth, among other things, the sale price for each Apartment, and the rent presently being charged each of the tenants in the Apartments. Each Apartment was priced between approximately $680,000 and $870,000; the total for all ten Apartments was $8 million. The average rent for one of the rent-regulated Apartments was approximately $800 per month.

   d. A second document attached to the Master Rider provided for the Seller's assignment to A&L of the Seller's interest in the tenants' leases and security deposits related to the Apartments.

   e. A third document attached to the Master Rider provided A&L with a form letter to send to the tenants of the Apartments informing each tenant, among other things, that each Apartment was under new ownership, and directing the tenant to send all future rent payments to the new owners.

   10. In or about January 2006, each of the five Individual Purchasers executed separate contracts of sale for the ten Apartments at 243 West 98th Street, New York, New York ("the Individual Contracts"). Each of the Individual Contracts contained documents similar to the Master Contract, described above in paragraph 7, including a contract of sale (the "Individual Contract") and a rider (the "Individual Rider"). I have reviewed the executed Individual Contracts, and I have learned the following:

   a. Each of the Individual Purchasers was represented by ALEXANDER KAPLAN, the defendant.

   b. In assuming ownership of the Apartments, each Individual Purchaser signed the Individual Rider, as part of the Individual Contracts, which explicitly set forth, with respect to each Apartment, the following: (1) the property was subject to New York's rent regulation laws; (2) the property was occupied by a tenant; (3) the Individual Purchaser was sophisticated and experienced in the ownership and management of rent-controlled and rent-stabilized apartments; and (4) the Individual Purchaser was represented by sophisticated counsel in connection with the transaction.

   c. A document attached to the Individual

4

Contract for each Apartment set forth the rent that the tenant of the Apartment was obligated to pay.

11. I have spoken with the Seller's Attorney, who informed me that the Seller's Attorney personally negotiated the terms of the Master Contract, including the Master Rider, described above in paragraph 7, as well as all ten of the Individual Contracts, including the Individual Riders, described above in paragraph 8, with ALEXANDER KAPLAN, the defendant.

12. I have reviewed documents that were submitted to the lenders in support of mortgage and home equity applications for each of the Apartments. Based on my review of these documents, I have learned that over the course of two separate days in January 2006, the Individual Purchasers closed the sale of the Apartments with the assistance of ALEXANDER KAPLAN, the defendant, and others, and obtained mortgages to finance the purchase of the Apartments. As recounted below, these mortgages were obtained through the use of false and misleading statements:

    a. Each of the Individual Purchasers submitted uniform loan application forms ("Form 1003s") to various lenders for one, and in some cases two, Apartments in which the Individual Purchaser represented that he or she intended to live in the Apartment as his or her "primary residence." Thus, financing for seven of the ten Apartments was sought based on representations that the Apartments were to be owner-occupied properties. These representations were made on Form 1003s, which the Individual Purchaser signed and swore to the accuracy thereof.

    b. In addition, certain of the loan applications included an "occupancy affidavit," which was also signed by the Individual Purchaser. The occupancy affidavits typically stated that the Individual Purchaser intended to occupy the property within a certain period of time, and that the lender would not have made the loan if the property were not going to be owner-occupied.

    c. In loan applications for the remaining three Apartments, certain Individual Purchasers submitted Form 1003s, which the Individual Purchasers signed and swore to the accuracy thereof, in which the Individual Purchasers indicated that the Apartments were to be used as "investment" properties. In these loan applications, representations were made to the lender reflecting that each Individual Purchaser, respectively, expected to receive approximately $6500 per month in rent from the purported tenant of each of the Apartments.

APP 0617

    d. The lenders were provided with the Individual Contracts, as described above in paragraph 8, for each of the Apartments. None of the lenders, however, was provided with the Individual Rider to the contract.

    e. None of the documents submitted to the lenders disclosed that: (1) certain Individual Purchasers were seeking loans to purchase more than one "primary residence;" (2) each of the Apartments was already occupied by a tenant, and therefore not suitable for a primary residence; or (3) the Apartment was subject to rent regulation laws that precluded the Individual Purchaser from charging $6500 in rent.

    f. ALEXANDER KAPLAN, the defendant, acted as the attorney for each Individual Purchaser, as well as the lender's attorney, during the closing of each Apartment.

    g. The closing instructions for certain of the lenders required ALEXANDER KAPLAN, the defendant, to obtain signed and completed documents, including, among other things, a signed Form 1003, on which the Individual Purchaser indicated whether the property was to be a "primary residence" or an "investment property," and a signed occupancy affidavit, and to submit them to the lender.

   13. In the course of my investigation, I have learned that the Individual Purchasers are all related – i.e., by blood or by marriage – in some respect to each other <u>and</u> either to Lipkin and/or CC-1. Based on my review of the loan applications for the Apartments, none of the lenders was informed of the fact that the transactions between A&L and the Individual Purchasers were not conducted at "arms-length."

   14. I have spoken with the Seller's Attorney, who informed me that the closing for the sale of the Apartments took place at the law office of ALEXANDER KAPLAN, the defendant, over the course of two separate days, and KAPLAN was present during both days of the closing to represent his various clients.

   15. I have spoken with an underwriter for one of the lenders that extended mortgages to two of the Individual Purchasers for the purchase of three of the Apartments. I have learned that the underwriter relied on representations made by the Individual Purchasers regarding, among other things, their intention to occupy the subject properties and their expected rental income in making lending decisions regarding the amount and the terms of the loans to be extended.

16. I have also learned from a representative of one of the lenders that in the course of financing mortgages for three of the Apartments, the original mortgage contract was signed, recorded and then typically returned by the Postal Service to the lender's home offices, where the original mortgages are maintained.

17. In the course of my investigation, I have learned that, within a matter of months, of the ten Apartments initially sold to the Individual Purchasers, seven were re-sold, or "flipped," to "straw buyers," or persons who agreed to permit their names to be used on sale documents and loan applications, but who otherwise had no control over the Apartments. The Individual Purchasers, with the assistance of Lipkin, CC-1 and others, caused the straw buyers to submit additional loan applications to lenders which contained false and misleading information, for the purpose of obtaining loans, the result of which was that Lipkin and others earned hundreds of thousands of dollars in profit.

WHEREFORE, deponent prays that an arrest warrant be issued for ALEXANDER KAPLAN, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
MICHAEL SEIFER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
_____ day of June 2007.

s/ Debra Freeman
_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK